FILED
2015 Apr-23  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| TALETHIA DARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13-cv-00584-JEO |
| | ) | |
| THE LEARNING TREE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action, Talethia Dark ("Plaintiff") brings a claim against her former employer, The Learning Tree, Inc. ("Defendant"), alleging that she was discharged in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, in retaliation for having taken protected medical leave in the past, to prevent her from taking additional protected leave, or both.  (Doc.[1] 1 ("Complaint" or "Compl.")).  The parties have consented to an exercise of plenary jurisdiction by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P.  73.  (Doc. 10).  The now cause comes to be heard on Defendant's motion for summary judgment.  (Doc. 15).  Upon consideration, the court concludes that the motion is due to be granted.

---

[1]References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the CM/ECF system.  Unless otherwise noted, Pinpoint citations herein are to the page of the electronically filed document, which may not correspond to the pagination on the original "hard copy."  However, pinpoint citations to deposition testimony are to the page of the transcript.

## I.     SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, a party is authorized to move for summary judgment on all or part of a claim asserted against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. PROC. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.  Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PROC. 56(c)(1)(A), (B).  In its review of the evidence, a court view the evidence in the light most favorable to the non-movant. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

II.     **BACKGROUND**[2]

Defendant is a nonprofit organization that provides educational and support services in residential settings for children and teens with developmental disabilities, including autism. (Doc. 16-19, Declaration of Marc Williams ("Williams Decl.") ¶ 2).  Plaintiff commenced her employment with Defendant in 1999.  (Doc. 16-1, Deposition of Plaintiff Talethia Dark ("Pl. Dep.") at 12).  In 2010, she began working as a Residential Support Supervisor at Defendant's campus in Jacksonville, Alabama.  (Pl. Dep. at 16-18; Williams Decl. ¶ 4).  In that capacity, she was charged with supervising staff providing direct care to students in several group homes on the overnight shift.  (Doc. 17-1, Deposition of Patricia Murphy ("Murphy Dep.") at 10-11). Plaintiff's immediate supervisors were Jenny Dooley and Dooley's assistant, Ed Clark.  (Pl. Dep. at 18).  Dooley, in turn, reported to Regional Director Patricia Murphy, the highest-ranking employee at the Jacksonville Campus.  (Doc. 16-13, Deposition of Jenny Dooley ("Dooley Dep.") at 8; Murphy Dep. at 7-10; Doc. 17-2 at 2).  As further explained below, Defendant terminated Plaintiff's employment on August 29, 2012, allegedly for failing to report that another overnight supervisor was found sleeping on the job.

Some eight months before she was discharged, however, in late December 2011, Plaintiff gave notice to Defendant that she needed to take medical leave under the FMLA in connection with a surgery to remove her gallbladder.  (Pl. Dep. at 19-24, 39-40).  Plaintiff's doctor had recommended the procedure to address gastrointestinal problems that Plaintiff had been

---

[2]The summary in this section is taken from the court's review of the record evidence submitted by the parties.  Consistent with the court's obligation at summary judgment, the record is viewed in the light favorable to the Plaintiff.  Accordingly, these are the "facts" only for purposes of Defendant's instant motion; they may not be the actual facts.

experiencing, which included vomiting, abdominal pain, and loss of appetite.  (*Id.* at 19-30).

Murphy was responsible for approving FMLA leave requests made by employees on the

Jacksonville campus (Murphy Dep. at 69; Pl. Dep. at 80), and she approved Plaintiff's request on

this occasion without incident.  (Pl. Dep. at 39-40, 73; Murphy Dep. at 7).  Plaintiff thus

commenced her FMLA leave on December 24, 2011, and she had the surgery as scheduled on

January 4, 2012, during which she also underwent an elective procedure to remove a portion of

her stomach to facilitate weight loss. (Pl. Dep. at 20, 28; Plaintiff's 2011-2012 Leave Records

("Leave Records")).  Plaintiff initially applied for FMLA leave though January 9, 2012.  (Doc.

17-5 at 1).  After the surgery, however, Plaintiff continued to have problems, and she was

readmitted to the hospital to undergo additional testing and procedures in the ensuing weeks.  (Pl.

Dep. 30-36).  Because of these complications, Plaintiff requested additional FMLA leave, which

was also granted, and she remained out through February 6, 2012.  (*Id.* at 40-41; Leave Records).

Even after returning from FMLA leave, however, Plaintiff still continued to experience

problems periodically.  (Pl. Dep. at 42-44).  Plaintiff advised Defendant's payroll administrator

that her condition would require her to take intermittent FMLA leave going forward.  (*Id.* at 41,

46-48).  That request was also approved, apparently by Murphy.  According to Defendant's

records, between Plaintiff's return to work in early February 2012 and her termination that

August 29th, Plaintiff missed all or some part of her scheduled shift on 18 occasions.  (Leave

Records).  Given the structure of Plaintiff's work schedule, under which she worked two 15-hour

shifts on the weekend and one 10-hour shift during the week, such was the equivalent of missing

about five 40-hour workweeks in total.  (Leave Records; Pl. Dep. at 51).  However, Defendant

designated only three of those missed shifts, June 10, July 7, and July 8, as FMLA-qualifying

leave.  (Leave Records).  By contrast, the first two shifts that Plaintiff missed after returning in

early February from extended leave, on March 31 and April 1, were coded simply as "unpaid,"

while five others, May 13, June 2, June 3, August 12, and August 19, were coded as non-FMLA

"illness" leave.  (*Id.*)  The remaining eight shifts that Plaintiff missed, on April 14, April 15,

April 21, April 22, July 29, August 4, August 5, and August 24, were all classified as "General"

leave, which Plaintiff says denoted annual vacation time.  (Attendance Records; Pl. Dep. at 55-

56, 61-62).

       On August 23, 2012, the supervisor over Defendant's adult program in Jacksonville,

Tiffany Canady, was cleaning up the vacated work area and computer that had been assigned to

April Nelson, Canady's former assistant who had recently taken another position within the

company.  (*See* Pl. Dep. at 142; Doc. 16-17, Deposition of Tiffany Canady ("Canady Dep.") at

10, 15-17, 26; Doc. 17-1, Deposition of Patricia Murphy ("Murphy Dep.") at 44-45).  In the

course of that endeavor, Canady also began to look into why Nelson had arranged to have some

emails addressed to Canady forwarded to Nelson's computer.  (Canady Dep. at 15-17, 27-28).

That led Canady to discover the following email exchange dated, Wednesday, October 19, 2011,

some ten months prior, between Nelson and Plaintiff:

         Nelson:      Caught Neicy sleeping in the van this morning I hope Lisa didn't
                            see her, she hasn't said anything yet

         Plaintiff:     omg did you wake her up

         Nelson:      Yeah, I went outside because spring garden wanted to send me a
                            pic of wacky day, I saw her asleep.  I wasn't going to because I saw
                            lisa (sic) suv.  Then I knoncked (sic) on the window, she got out
                            and said am I being sent home.  I said not bye (sic) me but lisa was
                            here.

Plaintiff:        maybe she didnt (sic) but Ammie will tell if she does so just wait.
                  OAN: she pissed me off so bad last night her and her damn kids\
                  (sic)

(Doc. 16-3).  These emails refer to three other employees of Defendant: "Neicy" is Phenecia

Willis, who, similar to Plaintiff, supervised direct care staff on the overnight shift (Pl. Dep. at 94-

95; Murphy Dep. at 37); "Lisa" is Lisa Spurling, a non-supervisory employee who worked in

"Resource Development" (Pl. Dep. at 115-16; Murphy Dep. at 50); and "Ammie" is Ammie

Pike, another overnight supervisor who frequently worked with Willis.  (Pl. Dep. at 119; Murphy

Dep. at 52).  Plaintiff further clarified that her use of "omg" and "OAN" in the emails were

acronyms for "oh my gosh" and "on another note," respectively.  (Pl. Dep. at 99, 118).

When Canady read the emails, she took them to convey that Nelson had told Plaintiff that

she, Nelson, had caught Willis asleep on the job.  Under Defendant's policies, sleeping on the job

is treated as a serious infraction that is categorized as "gross misconduct" that may be grounds

for immediate termination.  (Doc. 17-2 at 14-15; *see also* Pl. Dep. at 100-101).  Sleeping on the

job may also constitute a "neglect" of a student, in violation of Defendant's policy that prohibits

"abuse, neglect, or mistreatment" of a student.  (Doc. 17-2 at 4-5; Williams Dep. ¶ 7; Pl. Dep. at

132; Murphy Dep. at 32).  Indeed, it is undisputed that, if it was determined that an employee

was sleeping on the job, it resulted, at least in almost all cases, in the offender's discharge.[3]

(Murphy Dep. at 93; Canady Dep. at 31, 34; Pl. Dep. at 101-02, 108-110).  It is also undisputed

that Defendant's employees generally have a duty to report to their supervisor when they are

aware or suspect that another employee has committed a violation constituting abuse, neglect, or

---

[3]Although the time period they cover is unclear, it appears that Defendant produced about 80
termination notices it had handed out to employees for sleeping on the job.  (Murphy Dep. at 93).
However, some occasions in which sleeping on the job, actual or suspected, did not result in the
employee's termination are discussed later in the text.

mistreatment, including sleeping on the job.  (Doc. 17-2 at 4-5, 14-15; Murphy Dep. at 24-29, 51;

Pl. Dep. at 130-37, 157-58).  Despite that, neither Nelson, Plaintiff, nor anyone else reported

Willis for sleeping on the job at the time of the incident in October 2011.  (Pl. Dep. at 128;

Murphy Dep. at 51-52, 56).

Upon discovering the emails on August 23, 2012, however, Canady showed them to her

supervisor, Murphy.[4]  (Canady Dep. at 28).  By late that same afternoon, Willis was placed on

unpaid administrative leave for allegedly sleeping on the job.  (Doc. 16-6 at 2; Murphy Dep. at

40).  Several days later, just after midnight on the morning of August 29th, Willis tendered her

resignation via an email to her supervisor, Dooley, stating, "Due to the current circumstances I

prefer to resign than be fired.  Please inform my staff, co-works (sic) and students, that I am

sincerely sorry to have let them down."  (Doc. 16-6 at 1).  Dooley forwarded that email to

Murphy that morning at 10:49 a.m.  (*Id.*; *see also* Murphy Dep. at 128-29).  It is undisputed,

however, that at no time before or after that resignation did Murphy question Willis about the

circumstances under which she was alleged to have fallen asleep in October 2011, nor did

Murphy task anyone with interviewing Willis about that episode.  (Murphy Dep. at 20-21, 30,

39-40).

Meanwhile, Murphy had called her superior, Dr. Marc Williams, Defendant's Executive

Director who worked in Defendant's Tallassee, Alabama, office to discuss possible disciplinary

action against Plaintiff and Nelson for failing to report Willis for sleeping on the job.  (Murphy

---

[4]The court would note that it is undisputed that Canady was generally on good terms with both
Plaintiff and Nelson.  (Canady Dep. at 26, 30-42; Pl. Dep. at 143).  Further, Plaintiff makes no
argument, nor is there evidence reasonably supporting, that Canady was looking at Nelson's
emails or that Canady reported the emails about Willis sleeping in an effort to get Nelson or
Plaintiff "in trouble" because of FMLA leave.

Dep. at 54; Doc. 16-14, Deposition of Marc Williams ("Williams Dep.") at 7, 17; Williams Decl. ¶ 1). As Executive Director, Williams had sole termination authority and thus had the final decision on such matters. (Williams Dep. at 27). Williams testified that it was clear to him from reading the emails that Nelson had directly witnessed Willis being asleep; that Nelson had communicated that circumstance to Plaintiff; and indicated that she, Nelson, was not going to report it. (Williams Dep. at 9-10, 28-29; *see also* Doc. 16-14 at 16-17). Murphy testified that she interpreted the emails similarly and that she believed Plaintiff had a duty to report the incident but failed to do so. (Murphy Dep. at 18, 25-27, 49-53, 63-64). After Williams and Murphy reviewed the emails, they tentatively agreed, according to Murphy, that both Nelson and Plaintiff were due to be fired unless they could provide a satisfactory explanation for failing to report Willis for sleeping on the job. (Murphy Dep. at 56-58; Williams Dep. at 8-10, 26-30).

After talking with Williams, Murphy met with Nelson on August 29, 2012, to talk about the emails. (Murphy Dep. at 56). At that time, Nelson admitted she had indeed seen Willis sleeping in the van, as she had stated in her email to Plaintiff. (*Id.* at 30-31, 56). Murphy could not recall whether she told Nelson at the conclusion of that meeting that her employment was formally terminated. (*Id.* at 57). It is undisputed, however, that Nelson was ultimately discharged and presented with a written termination notice drafted by Murphy, dated August 29, 2012, authorized by Williams. (Doc. 16-5 at 1; *see also* Pl. Dep. 146). That notice recited that Nelson was fired for failing to report Willis for sleeping on the job, noting that "failure to report actual or possible abuse, neglect or mistreatment to a supervisory staff member is a violation of policy and procedures of The Learning Tree, Inc." (Doc. 16-5 at 1).

8

Later on August 29th, Murphy also met with Plaintiff to discuss the emails.  (Murphy Dep. at 56, 59; Pl. Dep. at 140-42).  However, shortly before that meeting, Plaintiff sat down with Dooley and Clark to review Plaintiff's annual job performance evaluation that they had prepared.  (Pl. Dep. at 76-77, 83, 140-42; Deposition of Jenny Dooley ("Dooley Dep.") Dooley Dep. at 10-12, 16, 21-22; Doc. 16-19, Deposition of Ed Clark ("Clark Dep.") at 11-12).  But at the time of that performance review, neither Dooley, Clark, nor Plaintiff were aware that the October 2011 emails had surfaced or that Plaintiff was potentially facing discipline as a result.  (Pl. Dep. at 141; Dooley Dep. at 10-11, 26; Clark Dep. at 13-14).  Accordingly, no mention was made of such matters either in Plaintiff's written job evaluation or during the review meeting.  In any event, Plaintiff's written evaluation itself shows that she received a cumulative score in the low range of "average," the third level on a five-tier scale.  (Doc. 16-13 at 14-16).  However, Plaintiff did receive an "unsatisfactory" rating, a "1" out of a possible "5," for her attendance, and she claims that Dooley specifically told her during the meeting that she needed to "work on" her attendance.  (*See id.* at 15-16; Pl. Dep. at 84-85).  Plaintiff responded by protesting to Dooley that such criticism was unwarranted, offering that "the only time that [she] had been out was on FMLA."  (Pl. Dep. at 84-85).  To that, Plaintiff says, Dooley simply replied, "Well, you know, you understand."  (*Id.* at 84).

Only about 20 minutes following Plaintiff's performance review, Murphy approached Dooley and told her that there had been some emails found that Nelson had sent to Plaintiff about Willis sleeping on the job.  (Dooley Dep. at 10-13).  Not revealing that Plaintiff might be fired, Murphy advised Dooley simply that they were going to talk with Plaintiff about the emails and then contact Williams.  (*Id.* at 10-13).  In the ensuing meeting, Murphy, with Dooley present,

confronted Plaintiff with the October 2011 emails.  (Pl. Dep. at 141-42).  Plaintiff asked how

they had found out about the emails, and Murphy said that they had been discovered and reported

by Canady.  (*Id.*)  Plaintiff also noted that the copy of the email appeared to have been printed out

several days earlier, on August 23rd, and she asked why the issue was not raised then.  (*Id.* at

143).  Murphy replied that they had waited because Williams had been out of town.  (*Id.*)

Murphy further told Plaintiff that Williams had asked her, Murphy, to inquire into the emails,

and after Plaintiff and Murphy spoke, Murphy left the room and went to her office.  (*Id.* at 145;

*see also* Dooley Dep. at 15).  She returned shortly thereafter and said that Williams had directed

her to "fire them all."  (Pl. Dep. at 145; *see also id.* at 151; Murphy Dep. at 62, 65, 67; Dooley

Dep. at 15).  Accordingly, Murphy presented Plaintiff with a written notice that her employment

was terminated for violating Defendant's policy against client abuse, neglect, and mistreatment

by failing to report that Nelson had caught Willis sleeping on the job.  (Pl. Dep. at 95-96; Doc.

17-4 at 4; Dooley Dep. at 15).  When Murphy told Plaintiff that Williams had decided to fire her,

Murphy, Dooley, and Plaintiff all became very emotional and started crying.  (Pl. Dep. at 147,

155).

        As it related to the mechanics of the decisional process, Williams denied recalling that

Murphy had made a "recommendation" that he should fire Plaintiff.  (Williams Dep. at 26).

However, when asked whether he and Murphy were "both on the same board, the same team,"

with regard to the decision to discharge Plaintiff, Williams acknowledged that to have been the

case as far as he could remember.  (Williams Dep. 27-28).  Murphy likewise did not recall

making a "recommendation" to fire Plaintiff, although she indicated that she did not disagree

with that decision.  (Murphy Dep. at 65).

Plaintiff subsequently filed this action against Defendant, claiming that her discharge interfered with her right to take protected FMLA medical leave and also constituted retaliation for having availed herself of protected leave.  Following discovery, Defendant moved for summary judgment.  (Doc. 15).  Defendant supported that motion with an evidentiary submission (Docs. 16, 17) and a brief.  (Doc. 18 ("Dft. Summ. J. Brief")).  Plaintiff likewise filed a brief in opposition (Doc. 20 ("Pl. Opp. Brief")), and Defendant filed a reply thereto.  (Doc. 24 ("Dft. Reply")).  Accordingly, Defendant's motion for summary judgment is ripe for decision.

## III.    DISCUSSION

The FMLA's central provision guarantees eligible employees 12 weeks of unpaid leave in a one year period because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D).  *See also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86-87 (2002); *Cooper v. Fulton County, Ga.*, 458 F.3d 1282, 1285 (11th Cir. 2006); *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005).  Leave must be granted, when "medically necessary," on an interim or part-time basis.  29 U.S.C. § 2612(b)(1).  The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" substantive rights.  29 U.S.C.§ 2615(a)(1), and violators are subject to consequential damages and appropriate equitable relief.  29 U.S.C. § 2617(a)(1).  "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."  *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239

F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted); *see also* 29 U.S.C. § 2615(a);

*Hurlbert v. St. Mary's Health Care Syst., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006).  Plaintiff is

pursuing both types of claims.  (*See* Compl. ¶ 43; Pl. Opp. Brief at 20, 31).  The court will first

consider her retaliation theory.

### A.      FMLA Retaliation

Plaintiff claims that Defendant terminated her employment in retaliation for exercising

her right to take medical leave protected under the FMLA.  The parties agree that Plaintiff is

attempting to prove Defendant's unlawful motive through circumstantial evidence and that this

claim is subject to the familiar burden-shifting framework established by the Supreme Court in

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v.*

*Burdine*, 450 U.S. 248 (1981).  *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243

(11th Cir. 2010); *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234-35 (11th Cir. 2010); *Martin*

*v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008); (Dft. Summ. J. Brief at 20-

21; Pl. Opp. Brief at 20).  Under that framework, the plaintiff has the initial burden to prove a

prima facie case of discrimination.  *Burdine*, 450 U.S. at 252-53.  "Under the *McDonnell*

*Douglas* scheme, 'establishment of the prima facie case in effect creates a presumption that the

employer unlawfully discriminated against the employee.' "  *St. Mary's Honor Center v. Hicks*,

509 U.S. 502, 506 (1993) (quoting *Burdine*, 450 U.S. at 254).  This presumption "places upon

the defendant the burden of producing an explanation to rebut the prima facie case- *i.e.*, the

burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate,

nondiscriminatory reason.' "  *Id*., 509 U.S. at 506-07 (quoting *Burdine*, 450 U.S., at 254).  Once

the defendant produces sufficient evidence to support a nondiscriminatory explanation for its

decision, the plaintiff must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (*quoting Burdine*, 450 U.S. at 253).

The parties further agree that the formulation of the elements of a prima facie case in this context is set out in the Eleventh Circuit's decision in *Krutzig*, as follows:

> A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two. *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001). The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were "not wholly unrelated." *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action. *Id.* Temporal proximity alone, however, is not sufficient to establish a causal connection when there is unrebutted evidence that the decision maker was not aware of the protected activity. *Id.* Furthermore, knowledge on the part of persons other than a decision maker cannot be imputed from other supervisors to the decision maker for purposes of an FMLA retaliation claim. *Id.* at 800.

602 F.3d at 1234-35; (*see also* Dft. Summ. J. Brief at 20-21; Pl. Opp. Brief at 20). Defendant is willing to assume for present purposes that Plaintiff engaged in protected activity by taking FMLA-qualifying leave and that her discharge is an adverse employment action. (Dft. Summ. J. Brief at 21). Rather, Defendant argues only that Plaintiff cannot establish the third prima facie element: a causal nexus between the leave and the termination. (*Id.*)

13

In particular, Defendant argues that Plaintiff cannot show that her discharge was motivated by an unlawful animus based on protected FMLA leave because Williams had sole authority to terminate Plaintiff's employment, and he has testified that he did not know that Plaintiff had taken FMLA leave or anything about her absences. (*See* Williams Dep. at 19, 21, 27). Plaintiff does not dispute that the evidence shows that Williams had sole authority to terminate and thus had the formal, "final say," so to speak. (Pl. Opp. Brief at 20). Plaintiff also does not offer proof contesting Williams's claim that he lacked knowledge of protected activity on Plaintiff's part. Thus, Defendant is correct that Plaintiff cannot make out a prima face case based upon the proposition that Williams harbored an unlawful motive. *See Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 832 (11th Cir. 2015).

Plaintiff maintains, however, that Defendant is still liable based on *Murphy's* involvement in the termination decision. (Pl. Opp. Brief at 21-22). Plaintiff highlights that Murphy was aware that Plaintiff had taken FMLA leave, including intermittently after returning to work in early February 2012. (*See* Murphy Dep. at 73). From there, Plaintiff argues that Murphy used Williams as her "cat's paw" to get Plaintiff fired. (Pl. Opp. Brief at 21-22). Under a "cat's paw" theory, a plaintiff seeks "to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n.6 (11th Cir. 2013); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 1190 & n.1 (2011). The Eleventh Circuit has recognized that causation in an employment discrimination case may so established

14

> if the plaintiff shows that the decisionmaker followed the biased recommendation
> [of another employee] without independently investigating the complaint against
> the employee.  In such case, the recommender is using the decisionmaker as a
> mere conduit, or "cat's paw" to give effect to the recommender's discriminatory
> animus.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam); *see also*

*Llampallas*, 163 F.3d at 1249 ("If ... [the decisionmaker] did not conduct his own independent

investigation, and instead merely 'rubber stamped' the recommendations of [those who held a

discriminatory animus], the causal link between [the plaintiffs'] protected activities and their

subsequent termination, would remain intact." (quoting *Long v. Eastfield College*, 88 F.3d 300,

307 (5th Cir. 1996) (bracketed material in *Llampallas*)); *Crawford v. Carroll*, 529 F.3d 961, 979

n. 21 (11th Cir. 2008).

Murphy was undisputedly involved in the decisional process that led to Plaintiff's

termination, and the evidence supports that she at least expressed agreement with that outcome to

Williams.  Murphy also admits that she was aware at the time of the decision that Plaintiff both

had taken extended FMLA leave earlier in the year and intermittent FMLA leave thereafter.

Defendant also does not specifically argue that Williams performed his own investigation or

exercised independent judgment such that might have purged any conceivable taint flowing from

Murphy's participation.  Given those circumstances, the court will assume that Plaintiff can

establish a prima facie case of retaliation based on Murphy's involvement.

Accordingly, the burden shifts to Defendant to point to evidence in the record supporting

that the adverse action was taken for some legitimate reason other than Plaintiff's protected

activity.  *See St. Mary's Honor Center*, 509 U.S. at 507-08; *Schaaf*, 602 F.3d at 1243.  Defendant

has done that.  Specifically, Murphy has testified that her relevant actions in connection with the

15

termination decision were motivated solely by her assessment that Plaintiff had violated company policy by failing to report that Nelson had found Willis asleep on the job.  (Murphy Dep. at 80).

Accordingly, the *McDonnell Douglas* burden swings back to Plaintiff to point to evidence from which a jury might reasonably find that Murphy's explanation is but a pretext to hide an animus related to Plaintiff's FMLA leave.  *Schaaf*, 602 F.3d at 1244.  "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.  "[A] plaintiff's prima facie case, combined with sufficient evidence that the [defendant's] asserted justification is false, may permit the trier of fact to conclude that the [defendant] unlawfully discriminated."  *Reeves*, 530 U.S. at 148.  "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).  The plaintiff "cannot succeed by simply quarreling with the wisdom of that reason."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  "In reviewing a summary judgment motion, "'the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

Plaintiff points to several pieces of evidence in an effort to prove pretext.  For starters, Plaintiff contends that Murphy failed to follow Defendant's standard procedures by declining to

16

appointing a service coordinator to formally investigate the issue of Willis sleeping on the job and by not reporting the incident to the Alabama Department of Human Resources ("ADHR") or the Alabama Department of Mental Health and Mental Retardation ("ADMH/MR"). In support, Plaintiff references that Defendant's policy against "Abuse, Neglect, and Mistreatment" of students covers sleeping on duty and provides that "any staff member witnessing, hearing, or suspecting an incident" must report it to their supervisor and write up an incident report that "shall be forwarded to the [ADHR] and the [ADMH/MR]." (Doc. 17-2 at 4-5). Defendant's policy on "Investigations" further specifies that "Informal Investigations will be conducted upon the occurrence of any incident," while "Formal Investigations will be conducted for all incidents reported to [ADMH/MR] and incidents of abuse/neglect reported to [ADHR]." (Doc. 17-2 at 11). Formal Investigations are generally performed by a service coordinator, who prepares a final report that is ultimately to be submitted to ADMH/MR. (*Id.* at 11-12). And Murphy acknowledges that she would have been the one to appoint a service coordinator to formally investigate the sleeping incident involving Willis but that she, Murphy, did not make any such appointment. (Murphy Dep. at 33-34).

It is well established that an employer's deviation from its own standard procedures may serve as evidence of pretext. *Hurlbert*, 439 F.3d at 1299. However, Plaintiff's proffer regarding Defendant's policies and Murphy's failure to commission a formal investigation or to report the Willis sleeping incident to state agencies is not up to the task. The record shows that Murphy herself did informally inquire into the matter by reviewing the emails between Plaintiff and Nelson, talking to Lisa Spurling (one of the employees Nelson had referenced in the emails as having been present), and by interviewing both Nelson and Plaintiff. (Murphy Dep. at 41-42, 51-

52, 56).  From those efforts, Murphy was able to develop an "understanding" that Willis had

fallen asleep only after performing rounds at her assigned group homes and returning to the

Jacksonville campus parking lot near the end of her shift, soon before she was to clock out. (*See*

Murphy Dep. at 15-16).  Murphy further indicates that she did not report the episode to any state

agency as an incident of abuse, neglect, or mistreatment of a student, both because of the time

that had lapsed since the incident and because Willis was not responsible for directly supervising

any students when she fell asleep.  (*Id.* at 14-16, 35-36).   The evidence thus does tend to support

that Murphy concluded that the circumstances under which Willis fell asleep did not present a

material threat of immediate harm to any student.  However, even Plaintiff does not dispute,

indeed, she emphasizes, that to have been the case.  (*See* Pl. Opp. Brief at 15, ¶ 88; *id.* at 26).

But as such, Murphy's explanation for failing to undertake more formal investigative or reporting

measures makes perfect sense and shows either that Murphy did not actually violate Defendant's

investigation policy at all or that any deviation was warranted by the nature of the situation.  *See*

*Schaaf*, 602 F.3d at 1244.

     Next, Plaintiff claims that both of her immediate supervisors, Dooley and Clark,

expressed displeasure with her taking protected medical leave.  Plaintiff highlights, for instance,

that, sometime when she was in the hospital on extended FMLA leave in January 2012, she

received a "rude" text message from Clark stating that her absences were "inconveniencing the

team."  (Pl. Dep. at 74, 77-78; *see also* Clark Dep. at 7-8 ("There was a duration of time where

she was a little sick, but she, I definitely missed the support of having her there during that

time")).  Plaintiff also references the fact that her job evaluation prepared by Dooley and Clark

criticized her attendance as "unsatisfactory," and that Dooley further commented during the

18

review that Plaintiff needed to "work on" her attendance.  (Pl. Dep. at 83-84; Doc. 16-14 at 14-16).  Plaintiff also notes that, even though Defendant designated only three of her missed shifts between March and August 2012 as FMLA leave, she contends that the seven other shifts she missed also qualified for FMLA protection as well but were mis-designated by Defendant as "unpaid" or non-FMLA "illness."[5]  Accordingly, Plaintiff argues, any problems that Dooley or Clark had with her attendance more generally equates to animus related to protected leave, regardless of whether Defendant formally designated the leave as "FMLA."

This argument misses the mark.  Although Dooley was present as a witness when Murphy communicated to Plaintiff that she was terminated, Dooley and Clark both deny any involvement whatever in the making of that decision.  (*See* Dooley Dep. at 10-15, 25-26; Clark Dep. at 13-16).  Plaintiff has not offered anything rebutting that.  Statements by employees not involved in the decision cannot demonstrate discriminatory intent.  *Rowell v. BellSouth Corp.*, 433 F.3d 794, 802 (11th Cir. 2005).  While remarks by decisionmakers can be evidence of bias, Plaintiff has not pointed to any statements by Murphy indicating that she harbored any animus or resentment against Plaintiff because she had taken leave, whether or not designated as FMLA.  Nonetheless, Plaintiff posits that Dooley or Clark likely communicated to Murphy that Plaintiff's spotty attendance was causing problems, thereby influencing Murphy.  Statements or complaints that Dooley or Clark might have made to Murphy about Plaintiff's FMLA leave or attendance shortcomings could go to show Murphy's knowledge of such underlying issues.  However, Plaintiff cannot prove bias on the part of *Murphy* based on evidence of comments that might

---

[5]Plaintiff concedes that the eight shifts she missed during the relevant period that were classified as "General" leave were vacation absences not protected by the FMLA.  (*See* Pl. Dep. at 56; Pl. Opp. Brief at 8, ¶ 23).

have been made merely *to* her, notwithstanding Plaintiff's instant "double cat's paw" theory.   In any event, Murphy denies recalling discussing Plaintiff's FMLA leave or attendance with Dooley or Clark (Murphy Dep. at 116), and Dooley and Clark likewise generally deny discussing such matters with Murphy.   (Dooley Dep. at 18, 20-21; Clark Dep. at 9-10, 13, 15).   Plaintiff offers no evidence to the contrary.   Plaintiff offers that a jury might still disbelieve their testimony and instead infer that they discussed Plaintiff's leave or attendance based on the fact that Murphy had a regular weekly meeting with Dooley to discuss operations matters generally, including, at times, employee performance.   (*See* Pl. Opp. Brief at 23; Dooley Dep. at 20).   However, in the face of the general denials by Murphy, Dooley, and Clark, the notion that they discussed Plaintiff's FMLA leave or criticized her attendance at those meetings amounts to speculation, not a reasonable inference.   *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999); *Burrell v. Board of Trustees of Ga. Military Coll.*, 970 F.2d 785, 791 n. 15 (11th Cir. 1992); *see also Landry v. Lincare, Inc.*, 579 F. App'x 734, 738 (11th Cir. 2014) (evidence was insufficient to support that decisionmaker was aware of another employee's misconduct based on testimony that there had been a "general" discussion in the office about it).   Because Dooley and Clark were not involved in the discharge decision, what they might have said or felt about Plaintiff's FMLA leave or attendance is generally unimportant to the pretext calculus.

Plaintiff's primary pretext argument, however, is that Murphy allegedly afforded more favorable disciplinary treatment to other employees.   Where the employer's asserted justification for adverse action is that the employee violated a work rule, an employee may prove pretext by showing that other employees not within the  protected class engaged in similar acts but were treated more favorably.   *See McDonnell Douglas*, 411 U.S. at 804; *Rioux v. City of Atlanta*, 520

F.3d 1269, 1276-77 (11th Cir. 2008); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.3d 1554, 1563

(11th Cir. 1987); *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 (1976).  In

order to be considered a valid comparator, the other employee who allegedly was treated more

favorably must be "similarly situated to the plaintiff in all relevant respects."  *Stone & Webster*

*Const., Inc. v. United States Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (quoting

*Rioux*, 520 F.3d at 1280).  The Eleventh Circuit has further emphasized that the "quantity and

quality of the comparator's misconduct must be nearly identical."  *Id.* (quoting *Burke-Fowler v.*

*Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2000) (per curiam)); *see also Mannicia v.*

*Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("We require that the quantity and quality of the

comparator's misconduct be nearly identical to prevent courts from second-guessing employers'

reasonable decisions and confusing apples with oranges.").  The focus of the inquiry is "whether

the employees are involved in or accused of the same or similar conduct and are disciplined in

different ways."  *Mannicia*, 171 F.3d at 1368.

    Plaintiff identifies three would-be comparators: Ernest Lockett, Verna Farnam-

Stephenson ("Verna")[6], and LaToya Johnson.  (Pl. Opp. Brief at 25-27).  Defendant responds by

arguing that none is similarly situated to Plaintiff such that any lesser discipline they received

might defeat the entry of summary judgment.  (Dft. Summ. J. Brief at 17-18, 20; Dft. Reply Brief

at 4-5, 7-8, 9-11).  The undersigned thus turns to consider the evidence related to Defendant's

disciplinary treatment of Lockett, Verna, and Johnson.

---

[6]In their respective briefs, both parties refer to this individual as "Verna Prause."  (See Dft.
Summ. J. Brief at 18, ¶ 88; Pl. Opp. Brief at 15, ¶ 88; *id.* at 26; Dft. Reply at 8, ¶ 88).  However,
the record seems to indicate that her name was actually Verna Farnam-Stephenson and that her
supervisor's name was Lindsay Prause.  (*See* Murphy Dep. at 115; *see also* Pl. Dep. at 102
(identifying "Verna" as having a last name beginning with "S")).  To avoid further confusion, the
undersigned will refer to this individual simply as "Verna."

Both Lockett and Verna were non-supervisory, direct care staff who were accused of sleeping on the job.  (See Pl. Dep. at 105, 111, 170).  In March 2012, Lockett's supervisor, Nelson, filled out an incident report that stated:  "While working on task with another student, I noticed [Lockett] still and his student signing for snack.  I sat and watched [Lockett] for [one] minute before I walked to his station where I saw his eyes were closed.  I then tapped him to wake him up."  (Doc. 17-5 at 12).  Upon receiving that report, Nelson's then-boss, Canaday, instructed Lockett to clock out and go home.  (Doc. 17-5 at 11).  Canady proceeded to forward Nelson's report to Murphy, who interviewed Lockett by phone the next day.  (Murphy Dep. at 97-98; Canady Dep. at 32-35; Doc. 17-5 at 11, 13).  During that conversation, Lockett admitted to being "sleepy," but he denied being "asleep" and further stated that Nelson did not "wake" or "touch" him or say anything to him at the time.  (Murphy Dep. at 98-99; Doc. 17-5 at 13).  Murphy then went back and spoke with Nelson.  (Murphy Dep. at 100-101; Doc. 17-5 at 14).  Murphy recounts that, while Nelson's initial incident report seemed to suggest that she saw Lockett asleep, when Murphy interviewed Nelson, she "changed her story" and was equivocal, reporting that, while she saw Lockett's head "nodding" and that his "eyes were heavy" and even "closed" when she went over to him, she was not sure that he was actually "asleep" rather that just "sleepy."  (Murphy Dep. at 100-102; Doc. 17-5 at 14).  Ultimately, Murphy gave Lockett the benefit of the doubt, determining that he had not actually been sleeping on the job.  (Murphy Dep. at 102-106).  After communicating her findings with Williams, Lockett was put back to work, receiving only a non-disciplinary "Letter of Instruction," which is akin to a written warning.  (Murphy Dep. at 106-110; Doc. 17-5 at 15-16).

Verna, on the other hand, was not fired despite the fact that, according to Plaintiff, Murphy actually determined she was sleeping on the job. (Pl. Dep. at 102-06). Specifically, Plaintiff relates that she came back to the office one day to find two behavioral analysts discussing that Verna had been found asleep on the job and that she was going to be fired. (*Id.* at 104-05). Plaintiff told them that they only had the authority to put Verna on administrative leave, not fire her. (*Id.* at 105). The analysts summoned Murphy, who ultimately instructed Plaintiff to advise Verna that she was not going to be discharged because, although she had admitted to falling asleep while on the clock, when she did so she had been left alone in the group home and thus was not responsible for supervising any students. (*Id.* at 106).

First, Plaintiff's situation is unlike Lockett's insofar as Murphy ultimately decided that she could not conclusively determine that Lockett had violated the work rule against sleeping on the job, even if he had come very close. By contrast, Murphy found that Plaintiff had violated a work rule because she had knowingly failed to report Willis after being made aware both that Nelson had clearly found Willis asleep on the job and that Nelson was not going to report the incident. Plaintiff argues that Murphy's absolution of Lockett shows she treated him more favorably because Nelson's accusation still showed that Lockett had at least closed his eyes for some discernable length time and Defendant's written policies indicate that a worker closing his eyes on duty is to be treated as the equivalent of sleeping. (*See* Doc. 17-2 at 4, ¶ F; *id.* at 15). But the two situations are still apples and oranges. Murphy was asked in Lockett's case to resolve two conflicting eyewitness accounts based upon ambiguous standards regarding whether Lockett was "sleeping" or merely "sleepy" and whether his eyes might have been "closed" for some period long enough to constitute a violation of the policy. In Plaintiff's case, most of the

underlying objective facts were undisputed, as Nelson had admitted to Murphy that she had indeed found Willis completely asleep on the job and had not reported it.  Plaintiff may have disputed her culpability for her failure to report and claimed that she was not truly sure that Willis was sleeping or that she knew all of the precise surrounding circumstances because she had herself witnessed the incident.  The fact of the matter, however, was that the emails were hard evidence that tended strongly to show, as Murphy found, that Plaintiff fully believed that Nelson had found Willis asleep on the job and that Nelson did not intend to report it.  Accordingly, Lockett is not a valid comparator.  *Cf. Cange v. Philadelphia Parking Auth.*, 451 F. App'x 210, 214 (3d Cir. 2011) (former employee terminated for sleeping on the job failed to establish that she was similarly situated to another employee that employer could not conclusively determine had been asleep on duty).

But even beyond that, neither Lockett nor Verna are similarly situated to Plaintiff for the more basic reason that, unlike them, Plaintiff was not direct care staff accused of sleeping on the job.  Instead, Plaintiff was a supervisor who was accused of purposely failing to report another employee that she had strong reason to know was sleeping on the job.  It bears emphasizing again at this point that Plaintiff's burden is to show that Defendant afforded favorable treatment to someone similarly situated to her, not someone similarly situated to Willis.  To be sure, an employer might view the offense of sleeping on the job as even more serious than the associated failure to report it, at least all other things being equal.  Nonetheless, "there is a distinct difference between not reporting seeing someone sleeping and actually sleeping, or appearing to sleep." *Owhor v. Providence Hosp. and Med. Centers, Inc.*, 2010 WL 3070106, at *9 (E.D. Mich. Aug. 4, 2010).  While a primary offense by a laborer may compromise workplace safety, a

supervisor's deliberate failure to report a known primary offense is a different animal because it amounts to a breach of the employer's trust. *See Wright v. Sanders Lead Co.*, 217 F. App'x 925, 929 (11th Cir. 2007).

Much of Plaintiff's argument on this front, however, is that Murphy's decision that Plaintiff was due to be fired for failing to report Willis simply makes no sense because Murphy admits she had not attempted to determine whether Willis's conduct actually violated the policy against abuse, neglect, and mistreatment of students or otherwise warranted even Willis's termination. To that end, Plaintiff highlights that Murphy understood that Willis had fallen asleep in the parking lot soon before she was due to clock out and was not directly supervising any students at the time. As such, Plaintiff characterizes Willis's offense as similar to Verna's, which Murphy found did not call for termination, thereby bringing into question Murphy's explanation for the decision to fire Plaintiff for merely failing to report Willis.

At the outset, however, it is at best unclear whether Willis would have escaped termination had she not preemptively resigned. *Cf. Ruiz v. County of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (plaintiff mental health worked fired for failing to report a co-worker's improper sexual relationship with a patient could not show he was treated more favorably than the co-worker who engaged in the affair who preemptively resigned). Regardless, Plaintiff's reasoning is flawed in her assumption that Murphy was bound to view Plaintiff's culpability for failure report Willis as directly derivative of or dependent upon the level of Willis's culpability. That is, Plaintiff seems to claim that Murphy needed to ascertain whether Willis herself deserved to be fired for sleeping on the job or at least that her conduct violated Defendant's policy against abuse, neglect, and mistreatment of students before Murphy could reasonably say that Plaintiff

25

deserved to be fired for failing to report Willis.  That is simply not so.  As the Eleventh Circuit

has explained:

> We do not sit as a 'super-personnel department,' and it is not our role to
> second-guess the wisdom of an employer's business decisions—indeed the
> wisdom of them is irrelevant—as long as those decisions were not made with a
> discriminatory motive.  *Chapman*, 229 F.3d at 1030.  That is true "[n]o matter
> how medieval a firm's practices, no matter how high-handed its decisional
> process, no matter how mistaken the firm's managers."  *Id.* (quotation marks and
> citations omitted).

*Alvarez v. Royal Atlantic Dev., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

Here, Defendant's disciplinary policy defines both sleeping on the job and violation of the

abuse, neglect, mistreatment policy as separate examples of "gross misconduct" that may call for

immediate termination.  (Doc. 17-2 at 14-15).  Thus, the disciplinary policy itself makes clear

that sleeping on the job is regarded a serious offense regardless of whether it might *also* amount

to student neglect.  Or, as Plaintiff herself admitted, "If any employee is sleeping on the job, ... it

is a big deal."  (Pl. Dep. at 101).  Murphy also testified expressly that she did not at all view

Plaintiff or Nelson's failure-to-report offense as dependent upon whether Willis's sleeping on the

job actually constituted abuse, neglect, or mistreatment of a student or itself warranted

termination.  (Murphy Dep. at 64).  Rather, Murphy stated that she considered the misconduct of

Plaintiff and Nelson, who appeared to have made a concerted, deliberate decision not to report

Willis, to present the more important matter than determining precisely how serious Willis's

transgression itself might have been.  (Murphy Dep. at 30-31, 126-27).  Murphy explained that,

even if Willis was not directly supervising students, she still was on duty and had responsibilities

until she clocked out, and Nelson or Willis had a clear duty as supervisors to report Willis for

sleeping on the job, regardless of whether they might have felt that her  conduct did not violate

the abuse, neglect, or mistreatment policy.  (Murphy Dep. at 15-16, 20-27, 39, 64).  Plaintiff

might believe that her culpability or level of punishment should depend upon whether Willis was

due to be fired.  However, the "inquiry into pretext centers on the employer's beliefs, not the

employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision

maker's head."  *Alvarez*, 610 F.3d at 1266 (citing *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th

Cir. 1997)).  Murphy unmistakably professed that she did not share Plaintiff's sentiment, and she

was not required to.

Plaintiff's third and final would-be comparator is LaToya Johnson, another direct care

staff member.  On February 10, 2012, Murphy and Williams gave Johnson a five-day unpaid

suspension after it was determined that she "failed to report possible sexual abuse of a student to

supervisory staff once she had become aware that this may have occurred."  (Doc. 17-6 at 6).

The suspension notice further recited the following:

> [S]ometime during the week of 12/26/11 ... Ms. Johnson acquired knowledge of
> the potential sexual abuse of a disabled student charged to her care[, but] she
> failed to report this to her supervisor.  On 1/17/12 Ms. Johnson called another
> employee who ... works with the disabled child and asked her if she had heard of
> the sexual abuse.  The on-duty staff member then reported this possible incident to
> her immediate supervisor.  Failure to report actual or possible abuse, neglect or
> mistreatment to a supervisory staff member is a violation of the policy and
> procedures of The Learning Tree, Inc.
>
> Ms. Johnson is being issued a five-day suspension for this failure to report
> possible sexual abuse of a disabled child and is being reminded and counseled that
> as an employee of The Learning Tree, Inc. she is a Mandatory Reporter....  Ms.
> Johnson is warned that any future lapse in following the reporting procedures for
> any possible or actual instance of abuse, neglect or mistreatment will result in
> termination of employment.

(*Id.*)

The circumstances surrounding Johnson's discipline are admittedly closer to those of Plaintiff insofar as both were accused of failing to make a report to supervisory staff as mandated by Defendant's policies.  And that Johnson was merely suspended without pay rather than discharged means, of course, that she was disciplined less harshly.  Defendant maintains, however, that Johnson was not similarly situated to Plaintiff, and was treated differently by Murphy, for two reasons.  First, Murphy stated that Johnson was not fired because she was only direct care staff, not a supervisor.  (Murphy Dep. at 112).  And second, Murphy indicated that Johnson had no "direct knowledge" of sexual abuse, but had merely suspected that it might have occurred, while Plaintiff clearly had reason to know, and appeared to have subjectively believed, that Willis had, in fact, been sleeping on the job, even if Plaintiff had not personally witnessed it. (*Id.* at 112-14).

Plaintiff argues, however, that both of these explanations for the disparate treatment of Plaintiff and Johnson are themselves pretextual and unworthy of credence.  With regard to Defendant's assertion that it disciplined Plaintiff more severely because she was a supervisor rather than direct care staff, Plaintiff posits that "it is a preposterous claim," incredible on its face.  (Pl. Opp. Brief at 10, ¶ 49).  However, Federal anti-discrimination laws "[do] not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Mannicia*, 171 F.3d at 1369.  It is in no way patently unreasonable or inherently suspect that an employer might have higher expectations or impose harsher discipline as it relates to employees who have greater experience or responsibility, who thus might be presumed to have greater knowledge of workplace rules and expected to set an example for their observance and enforcement. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326-27

28

(11th Cir. 2011); *Rioux*, 520 F.3d at 1280-81; *Mathis v. Wachovia Bank*, 255 F. App'x 425, 431 (11th Cir. 2007).

Plaintiff also contends that the evidence supports that, despite Defendant's claim to the contrary, Defendant does not, in fact, distinguish between supervisors and non-supervisors when it comes to the application of its policies related to reporting abuse, neglect, or similar violations. Plaintiff further observes that, in this circuit, "differences in job ranks ... are not, in an of themselves dispositive as to whether two individuals may be compared for the purposes of evaluating a discrimination claim." *Smith*, 644 F.3d at 1326 (quoting *Rioux*, 520 F.3d at 1281). Rather, "the relevant inquiry is whether the employer subjected differently ranked employees to the same or different employment policies." *Id.* (citing *Lathem v. Department of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999), citing, in turn, *Nix v. WYCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984)).  In support of her argument, Plaintiff quotes a portion of Defendant's abuse, neglect, and mistreatment policy, as follows:

> *Any staff member* witnessing, hearing, or suspecting an incident of abuse, neglect, or mistreatment must report such immediately to their immediate supervisor, write an Incident Report, and submit it before the end of their work shift.  Failure to do so will result in disciplinary action ranging from formal reprimand to termination.

(Pl. Opp. Brief at 10, ¶ 49 (quoting Doc. 17-2 at 5) (emphasis in Plaintiff's brief)).  Plaintiff insists that such makes clear that the policy "applies the same to all."  (Pl. Opp. Brief at 10, ¶ 49).  Plaintiff also points out that Murphy likewise testified that, "generally speaking," the reporting policy applies to managers and non-managers alike insofar as "everybody is a mandatory reporter of the company."  (Murphy Dep. at 114).

The foregoing admittedly does show that Defendant deemed all of its employees to be bound by a policy requirement to report any actual or suspected abuse, neglect, or mistreatment, including as it might relate to sleeping on the job.  However, that is not the same thing as showing that, once Defendant has determined that a violation of that reporting policy has occurred, Defendant's policy or practice was to mete out disciplinary action without regard to whether the offender is a supervisor or not.  It is true that Defendant's written policies do not say anything about supervisors being subject to greater punishment.  However, those policies also do not say that all employees are held to exactly the same disciplinary standards.  Further, the abuse, neglect, and mistreatment policy expressly acknowledges Defendant's reserved discretion to impose a range of possible punishments for a failure to report, presumably based on the facts of a particular case, which could well include the rank of the offender.  Both Murphy and Williams claim that supervisory status is, in fact, important to the severity of the punishment for a violation of the reporting policy.  (Murphy Dep. at 112; Williams Decl. ¶¶ 10-12).  Plaintiff has not pointed to any statement by either of them suggesting they do not honestly believe that to be so, nor has Plaintiff pointed to any supervisory employee that Defendant did not terminate after being found guilty of violating the reporting policy.  In the face of that, the fact that Defendant's written policies do not explicitly provide that supervisors are held to a higher disciplinary standard is insufficient to indicate that Murphy's assertion that Johnson's non-supervisory status accounted for any disparate treatment is a pretext.

Plaintiff also argues that Murphy's claim that Johnson was only suspended, rather than fired, for violating the reporting policy in part because Johnson lacked "direct knowledge" of any abuse makes no sense.  Rather, Plaintiff contends that, in this respect, she was actually the *same*

as Johnson because she, Plaintiff, likewise did not herself witness any violation on the part of Willis.  Indeed, Plaintiff claims that Johnson's alleged misconduct was much *worse* than Plaintiff's own because Johnson failed to report suspected sexual abuse of a disabled child, while Plaintiff failed to report only a suspicion that another employee was sleeping on duty.

The court concludes, however, that Plaintiff has failed to show that Johnson's conduct was "nearly identical" to that of Plaintiff.  As a threshold matter, it cannot be seriously doubted that, at least where all other things are equal, a failure to report suspected sexual abuse of a disabled minor is far more serious than the failure to report a co-worker for suspected sleeping on the job, particularly where it was understood that the co-worker would not have been directly supervising students at the time.  Nonetheless, while Plaintiff did not see Willis sleeping, Nelson had clearly told Plaintiff that she had seen Willis sleeping and woke her up, and Nelson had further indicated in her email to Plaintiff that she had not sent Willis home and did not intend to report the incident.  Plaintiff's own email responses also revealed that she had *believed* that Willis was sleeping and knew that to be very serious, including by her exclamation, "omg," or "oh my gosh," upon first hearing the news and asking Nelson whether she had woken Willis up. Likewise, Plaintiff admitted that she had no reason whatever to doubt what Nelson had told her. (Pl. Dep. at 100).  By contrast, the record as it relates to the specific circumstances surrounding Johnson's failure to report a suspicion of "possible sexual abuse" is hazy.  (Doc. 17-6 at 6). Johnson's disciplinary notice does reveal she was found to suspect that the student might have been sexually abused, insofar as Johnson was said to have asked a co-worker if she had heard of such abuse.  (*Id.*)  Plaintiff assumes that Johnson "learned about [the abuse] second hand," putting her in "the exact same situation as [Plaintiff]."  (Pl. Opp. Brief at 20).  However, there is

31

nothing in the record reasonably indicating that someone *told* Johnson about the student being sexually abused, never mind that such third party had themselves actually witnessed abuse. Indeed, just what form the possible sexual abuse might have taken and just what Defendant understood to have prompted Johnson's suspicions is entirely unclear from this record. Did Johnson see some physical injury on the student? If so, what did she see? Did she someone acting strangely around the student? If someone did tell Johnson something about abuse, who was it? What did they say and when? We simply don't know any of this. Without further information regarding the circumstances underlying the accusation made against Johnson, it cannot be determined that Johnson's misconduct was "nearly identical" so as to render her similarly situated to Plaintiff. *See Washington v. UPS, Inc.*, 567 F. App'x 749, 752 (11th Cir. 2014); *Dawson v. Henry County Police Dept.*, 238 F. App'x 545, 548 (11th Cir. 2007).

Even if it might be assumed, however, that Plaintiff's proffered evidence of pretext, including Defendant's treatment of Johnson or other the would-be comparators, has *some* probative value towards impugning the credence of Defendant's proffered reason, the record evidence, on the whole, is still insufficient to avoid summary judgment. In determining whether summary judgment is appropriate in any particular case, the court is to take into consideration a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 831-32 (11th Cir. 2000) (quoting *Reeves*, 530 U.S. at 148-49). Further, while a plaintiff's evidence making out a prima facie case might be strong enough to also show pretext, such is not always the case, meaning that a plaintiff will have to present additional

evidence to demonstrate pretext so as to avoid summary judgment.  *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998).  Thus, where the plaintiff's prima facie case is relatively weak and the evidence supporting the employer's proffered legitimate reason is strong, it may be more difficult to present sufficient evidence to a jury question as it relates to whether such reason is merely a pretext to hide unlawful discrimination.  *See id.; also cf. Reeves*, 530 U.S. at 148 ("An employer would be entitled to judgment as a matter of law if ... the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").  That is the uphill that Plaintiff faces at the pretext stage here.

The court has assumed that Plaintiff's evidence is enough to make out a prima facie case under a "cat's paw" theory based on Murphy's involvement in the termination decision.  That being said, the evidence that Murphy agreed that Plaintiff should be fired because Plaintiff had taken medical leave is very thin.  Murphy did know that Plaintiff had taken approximately six straight weeks of FMLA leave from late December 2011 to early February 2012.  But Plaintiff was not terminated until the end of August 2012, more than six months later, which is not close temporal proximity in the context of a prima facie case.  *See Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008).  Murphy also admits knowing that Plaintiff had also taken intermittent FMLA after returning to work following her surgery.  (Murphy Dep. at 73).  Still, Murphy denied keeping track of how much FMLA leave employees use after she approves their leave applications (*id.* at 69), and the record does not otherwise show that Murphy knew how much intermittent FMLA leave Plaintiff had taken, when she had done so, or even how many absences Plaintiff had more generally.

33

Further, it was Murphy herself who approved (1) Plaintiff's initial FMLA request for her surgery in late 2011, (2) her subsequent request to extend that leave through early February 2012, and (3) her final request seeking eligibility to take intermittent leave thereafter.  The fact that Murphy approved those FMLA leave requests does not preclude that she might have later thought that Plaintiff was taking too much leave, inconveniencing the company.  But Murphy's uneventful approval of Plaintiff's FMLA applications has some tendency to undercut the argument that Murphy sought to have Plaintiff fired for taking such leave.  *Cf. Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1442-43 (11th Cir. 1998) (evidence that same supervisor both hired and fired an employee may give rise to an inference that the employer's stated reason for the termination decision is not pretextual, but such evidence does not create a presumption to that effect).

The record shows that, as a result of the Willis sleeping episode, Defendant not only terminated Plaintiff but also discharged Nelson and placed Willis on unpaid leave pending further investigation, which was preempted when Willis tendered her resignation.  That seems like a lot of collateral damage if all you are trying to do is get of one employee because she had taken FMLA leave.  Plaintiff makes an attempt to connect Nelson's termination to her having taken FMLA leave as well, noting that Murphy acknowledged being aware that Nelson had taken such leave at some point.  (Murphy Dep. at 68-69).  However, the record is otherwise bare with regard to when Nelson had taken FMLA leave or how much, nor does it contain any statements indicating that Murphy harbored some animus on that account or because of any other absences by Nelson.  In the end, the record falls well short of allowing a reasonable inference that Nelson's termination was linked to FMLA leave.

34

Finally, Plaintiff concedes that she and Murphy were on good terms at work and that she did not know of any evidence suggesting that Murphy had a problem with her taking FMLA leave.  (Pl. Dep. at 147, 149, 155).  In fact, Plaintiff recounts that when Murphy told her that Williams had directed Murphy to fire her, Murphy said she was sorry and that she, Plaintiff, and Dooley, all became emotional and began to cry, leading Plaintiff to believe that both Dooley and Murphy were sorry to see her go.  (*Id.* at 146-48, 155).  It is conceivable that Murphy was putting on a show, shedding crocodile tears, but, at least generally speaking, such is not the reaction of someone who has manipulated the situation in order to orchestrate Plaintiff's discharge.  The court concludes that Defendant has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law as it relates to Plaintiff's FMLA retaliation claim.

## B.    FMLA Interference

The court now turns to Plaintiff's FMLA interference claim.  To make out a claim of interference with a substantive right under the FMLA, an employee must demonstrate that she was entitled to a benefit that was denied by the employer. *Drago v. Jenne*, 453 F.3d 1301, 1306 (11th Cir.2006); *O'Connor v. PCA Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000). The employee need not show that his employer affirmatively intended to deny a protected benefit, for the employer's motives in doing so are irrelevant. *Hurlbert*, 439 F.3d at 1293.  In other words, "a causal nexus is not an element of an interference claim." *Spakes v. Broward County Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir.2011).  However, the fact that an employee might seek to exercise FMLA rights does not mean that she is thereby insulated from discharge or other adverse action.  If an employer takes an adverse action that has the effect of preventing an employee from exercising an FMLA right, including taking protected leave, the

35

employer will not be liable if it is able affirmatively to prove that it took the adverse action for a reason unrelated to FMLA leave. *See id.*, 631 F.3d at 1310; *Schaaf*, 602 F.3d at 1241; *Krutzig*, 602 F.3d at 1236.

Plaintiff's interference claim is founded on the proposition that Defendant fired her in order to prevent her from taking additional intermittent FMLA leave. However, for the reasons set forth in the discussion of Plaintiff's retaliation claim, the record establishes as a matter of law that Defendant terminated Plaintiff's employment for misconduct, not because of FMLA leave. Therefore, Defendant is also entitled to summary judgment on Plaintiff's FMLA interference claim as well.

## IV.    CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment (Doc. 15) is due to be **GRANTED**.  A separate final order will be entered.

**DONE**, this the 23rd day of April, 2015.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge